FILED

09/30/2020

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 3, 2020

**IN RE BRADEN K.**

**Appeal from the Juvenile Court for White County**
**No. 4701JV-1492   Sammie E. Benningfield, Jr., Judge**

_____

**No. M2020-00569-COA-R3-PT**
_____

This case involves a petition to terminate the parental rights of a mother filed by the Tennessee Department of Children's Services. In the petition, the Department alleged five grounds for termination of the mother's parental rights. The juvenile court found that all five grounds were proven by clear and convincing evidence and that it was in the best interest of the child to terminate the mother's parental rights. As a result, the juvenile court granted the petition, and the mother appealed. We affirm the juvenile court's ruling and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded.**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and KRISTI M. DAVIS, J., joined.

Matthew Sewell Bailey, Spencer, Tennessee, for the appellant, Brandi K.W.[1]

Herbert H. Slatery, III, Attorney General and Reporter; and Lexie Ashton Ward, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

## I.    FACTS & PROCEDURAL HISTORY

Brandi K.W. ("Mother") is the mother of minor child, Braden K., who is the subject

---

[1] In actions involving a juvenile, the policy of this Court is to protect the privacy of children by using only the first name and last initial (and in some cases, just the initials) of the parties. *In re Jaiden C.W.*, 420 S.W.3d 13, 15 n.1 (Tenn. Ct. App. 2013).

of this case.[2] It is undisputed that Braden's putative father is Richard K. although he is not listed on the child's birth certificate, has never been a part of his life, and his whereabouts have remained unknown throughout this case. This appeal involves only Mother's parental rights because Richard is no longer a part of this case.

On January 4, 2018, the Tennessee Department of Children's Services ("DCS") received a referral that alleged Braden, a twelve-year-old boy, was suffering from a lack of supervision and psychological harm. The referral also alleged that Mother was abusing drugs and alcohol, and physically abusing her children. DCS investigated the referral and made an unannounced visit at Mother's home. During the visit, several drug-related items were found in the home, including: marijuana cigarettes in plain sight, a bag of marijuana, methamphetamine, drug paraphernalia, and a marijuana pipe in Braden's room. There were also signs of environmental neglect in the home, such as dirty dishes and trash throughout the home, molded food, and broken glass in Braden's bedroom. After the visit, Mother was incarcerated for possession of marijuana, methamphetamine, and drug paraphernalia.

On January 24, 2018, DCS filed a petition to declare Braden dependent and neglected and for emergency custody. On the same day, the juvenile court entered a protective custody order that placed Braden in the custody of DCS. Mother stipulated that Braden was dependent and neglected, and on March 19, 2018, the juvenile court adjudicated Braden dependent and neglected. Braden has remained in foster care since he was removed from Mother's custody on January 24, 2018.[3]

Following Braden's removal from Mother's custody, Julie Brown ("CM Brown"), a family service worker with DCS, was assigned to be the case manager of Braden's case. Throughout Braden's time in foster care, CM Brown worked with Mother to try and remedy many of the circumstances that led to Braden's removal. CM Brown and Mother developed a Family Permanency Plan that outlined requirements for Mother. Over the next two years, four permanency plans were developed and ratified by the juvenile court. Mother participated in the development of each plan and agreed to her responsibilities listed in the plans. The first plan was developed on February 15, 2018 and ratified on March 5, 2018. The final plan was developed on October 21, 2019 and ratified on November 18, 2019. CM Brown ensured that Mother understood the importance of completing the requirements in the plans and explained that if they were not completed, Mother's parental rights could be terminated.

The initial permanency plan, developed a few weeks after Braden's removal, listed

---

[2] Initially, Braden's sister was also included in this case, but she is no longer a part of the proceeding.

[3] Braden's sister was also adjudicated dependent and neglected and removed from Mother's custody on January 24, 2018.

several requirements for Mother to complete. The plan required Mother to complete an alcohol and drug assessment, a psychological assessment, and a parenting assessment and follow any corresponding recommendations; obtain a stable legal income that is sufficient to provide for Braden's basic needs; obtain safe and stable housing; resolve her criminal issues and not incur new charges; and sign a release form that would allow DCS to track Mother's progress by contacting her providers. The second permanency plan included the same requirements and added that Mother was to attend scheduled supervised visits, participate in phone calls, and write letters to Braden. The third plan included the same requirements as the first two and added that Mother was required to "take advantage of all visitations," and if financially able, "provide for [Braden's] needs during the visitation[s]." The final permanency plan included all of the same requirements as the prior three plans. Along with the plans' stated requirements, each plan also described Mother's responsibility to provide child support.

After the development of the first permanency plan, CM Brown made several attempts to help Mother complete her requirements. At various times, CM Brown provided Mother with a list of service providers; helped schedule appointments; offered to and occasionally did transport Mother to appointments and visitations; conducted drug screens and encouraged sobriety; and attempted to assess the environmental conditions of Mother's home. At monthly meetings with Mother, CM Brown would review Mother's requirements and emphasize the importance of completing the plan. Mother never told CM Brown that she could not complete any of the requirements. Despite Mother agreeing to the requirements in the plan and CM Brown's efforts to help Mother, the vast majority of the plan was not completed.

Of all the requirements in the permanency plan, Mother only completed one: signing releases for DCS to contact Mother's providers. She began a rehabilitation program but did not complete it. Additionally, she completed the initial phase of the alcohol and drug assessment but failed to follow any of the recommendations of the assessment. Mother did not "take advantage of all visitations" or provide Braden with essential items at visitations. Visitations were often rescheduled or cancelled due to Mother's repeated incarcerations. When Mother was not incarcerated, there were still several instances where she missed visitations without reporting to CM Brown. At times when visitations did occur, Mother admitted to drinking before visits and falling asleep during at least one visit. On several occasions, Braden either asked to leave the visitations early or to not visit at all. Even though Mother was given opportunities, support, and encouragement to complete the requirements in the plan, CM Brown stated she "has put forth no effort," and "there's no excuse not to."

Not only did Mother fail to complete the majority of the permanency plan requirements, she also continued to lead a tumultuous and illegal lifestyle. Over two years passed between Braden leaving Mother's custody and the final hearing in this case. During that time, Mother incurred several new criminal charges, including possession of a

schedule II substance, criminal impersonation, and multiple counts of violation of probation. As of the final hearing, Mother had four active criminal warrants. In the months directly following Braden's removal, Mother admitted to drinking and using methamphetamine.

Along with questioning Mother's sobriety, CM Brown also took issue with Mother's latest living situation. Throughout her involvement in this case, CM Brown visited Mother's home to assess her living environment. CM Brown described the home as a "camper trailer" or "somewhat of a shed" that had several concerning characteristics. Specifically, she stated that the home was without electricity, requiring an external connection to the home next to it by an extension cord. CM Brown also testified that the home had little ventilation, had pressboard flooring, and was very dirty. Despite the small size of the home, CM Brown testified that anywhere from eight to fourteen people would frequent the home when she would visit and several dogs were in the trailer. All of the visitors refused to submit to a drug screen and Mother admitted to using drugs, which led CM Brown to be concerned that drug activity was occurring in the home.

As for financial support, the record is devoid of any evidence that shows Mother provided child support for Braden since he left her custody. CM Brown testified that Mother did not contribute any support after Braden left her custody. This testimony is consistent with Mother's Tennessee Child Support Log (a copy of which was admitted as an exhibit) that showed, as of January 28, 2020, Mother paid zero support. CM Brown testified that Mother was aware of her duty to support because it was stated in the initial custody order, which Mother received a copy of, and she reminded Mother of the duty at their regular meetings. Mother provided no support despite being able-bodied and capable of working.

In contrast to Mother's actions throughout this case, Braden has progressed in a positive direction. Initially, Braden had behavioral and mental health concerns. At trial, CM Brown testified that Braden is now very well-behaved and receiving mental health counseling. She also testified that Braden no longer has a meaningful relationship with Mother but has an extremely positive bond with his foster parents, Donald O. and April O, who are also his prospective adoptive parents. CM Brown stated that Braden looks to Donald and April for love, support, and security and has even asked to be adopted by them. Donald also testified to Braden's time in their home. Donald stated that he and April have developed a bond with Braden and are "ready, willing, and able" to adopt him should they be allowed the opportunity to do so.

On April 11, 2019, DCS filed a petition to terminate Mother's parental rights.[4] In the petition, DCS alleged five grounds for termination: (1) abandonment for failure to

---

[4] Originally, the petition also included the putative father, but he was subsequently dismissed without prejudice.

support; (2) abandonment for failure to establish a suitable home; (3) substantial non-compliance with the permanency plan; (4) persistence of conditions; and (5) failure to manifest an ability and willingness to parent.

On February 7, 2020, the Juvenile Court of White County held the final hearing on the petition to terminate Mother's parental rights. At the hearing, three witnesses testified to the above-mentioned facts: CM Brown; Nate Theiss, a Sergeant at the White County Sheriff's Office; and Donald O. The court took special notice of Mother not attending the hearing despite there being no apparent reason for her absence.[5] At the end of the hearing, the court rendered an oral ruling. On March 25, 2020, the court entered its final written order.

In its written order, the juvenile court found all five grounds for termination of parental rights were proven by clear and convincing evidence. The court also found that it was in the best interest of Braden to terminate Mother's rights. As a result, the court granted the petition and terminated Mother's parental rights. Additionally, the court specifically found that all three witnesses were "absolutely credible" and "adopt[ed] the testimony of" all three witnesses.

Mother timely appealed.

## II.    ISSUES PRESENTED

Mother raises two issues on appeal, which have been copied verbatim from her brief:

1. Whether the juvenile court improperly determined that a ground existed to terminate the Mother's parental rights.

2. Whether the juvenile court improperly determined that the termination of the Mother's parental rights was in the child's best interests.

For the reasons stated herein, we affirm the juvenile court's ruling to terminate Mother's parental rights and remand.

## III.    STANDARDS OF REVIEW IN TERMINATION CASES

Previously, the Tennessee Supreme Court has described the gravity of proceedings

---

[5] CM Brown testified that she spoke with Mother a few days prior to the hearing to confirm that she knew the date and to offer to transport her to the courthouse. The morning of the hearing, CM Brown went to Mother's home, knocked at her door, called her name, and waited several minutes, but no one answered.

that involve the potential termination of parental rights:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. But parental rights, although fundamental and constitutionally protected, are not absolute. . . . When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it. Few consequences of judicial action are so grave as the severance of natural family ties. The parental rights at stake are far more precious than any property right. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of severing forever all legal rights and obligations of the parent or guardian of the child. In light of the interests and consequences at stake, parents are constitutionally entitled to fundamentally fair procedures in termination proceedings.

*In re Carrington H.*, 483 S.W.3d 507, 521-22 (Tenn. 2016) (footnote omitted) (citations omitted) (quotation marks omitted).

One of the protections afforded to parents in termination actions is the requirement that the petitioner prove the elements by clear and convincing evidence. *Id.* at 522; *In re Kaliyah S.*, 455 S.W.3d 533, 552 (Tenn. 2015); *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013). This heightened standard of proof "minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights." *In re Carrington H.*, 483 S.W.3d at 522. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005) (citation omitted). It must also "eliminate[] any serious or substantial doubt about the correctness of these factual findings." *In re Carrington H.*, 483 S.W.3d at 522 (quoting *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)).

In regard to this Court's role in cases involving the termination of parental rights, our Supreme Court has explained:

> Under [Tennessee Rule of Appellate Procedure] Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). . . . The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393

(quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010)].

*In re Carrington H.*, 483 S.W.3d at 524.

## IV. DISCUSSION

To terminate a party's parental rights, the petitioning party must prove two elements by clear and convincing evidence. *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017); *In re Kaliyah S.*, 455 S.W.3d at 552. First, the petitioner must prove at least one of the statutory grounds listed in Tennessee Code Annotated section 36-1-113(g). *In re Gabriella D.*, 531 S.W.3d at 681; *In re Kaliyah S.*, 455 S.W.3d at 552. Second, the petitioner must prove that terminating the parent's parental rights is in the best interest of the child. *In re Gabriella D.*, 531 S.W.3d at 681; *In re Kaliyah S.*, 455 S.W.3d at 552.

### A. Grounds for Termination

In this case, the juvenile court found that all five alleged grounds for termination of Mother's parental rights were proven by clear and convincing evidence. We shall review each ground separately. *See In re Carrington*, 483 S.W.3d at 525–26 (stating this Court must review each ground for termination, "regardless of whether the parent challenges" every ground alleged).

#### 1. Abandonment – Failure to Support

Abandonment is listed in Tennessee Code Annotated section 36-1-113(g) as a potential ground for termination of parental rights. *See* Tenn. Code Ann. §§ 36-1-102(1)(A), -113(g)(1). Tennessee Code Annotated section 36-1-102 defines "abandonment" as occurring when "[f]or a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent . . . , that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child." *Id.* § 36-1-102(1)(A)(i) (2019).[6] To avoid a finding of abandonment, a parent must provide more than token financial support. *In re Adoption of Angela E.*, 402 S.W.3d at 641; *In re Addalyne S.*, 556 S.W.3d 774, 787 (Tenn. Ct. App. 2018). "Token support" is support that, "under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B) (2019). If a petitioner sufficiently alleges that a parent has

---

[6] The relevant portions of the Code appear the same as they did when the petition was filed on April 11, 2019.

abandoned a child by failing to provide support, the parent may assert that the failure was not willful. Tenn. Code Ann. § 36-1-102(1)(I). The absence of willfulness is an affirmative defense that must be proven by a preponderance of the evidence. *Id.*[7] A child support order is not required to prove abandonment by failing to support because an adult parent is presumed to know that he or she has a duty to provide support. Tenn. Code Ann. § 36-1-102(1)(H); *In re Braxton M.*, 531 S.W.3d 708, 724 (Tenn. Ct. App. 2017); *In re Jacob M.J.*, 434 S.W.3d 565, 572 (Tenn. Ct. App. 2013).

DCS filed its petition to terminate Mother's parental rights on April 11, 2019. Accordingly, the relevant four-month period under section 36-1-102(1)(A)(i) is from December 11, 2018 to April 10, 2019. During the juvenile court proceedings, Mother did not assert a lack of willfulness as an affirmative defense to her lack of support, and she does not do so on appeal.

Instead, Mother argues for the first time on appeal that the juvenile court improperly determined she failed to support Braden because her child support log does not indicate whether the log relates to Braden or his sister. This argument is unpersuasive. The child support log is not the only evidence that shows Mother's lack of support. CM Brown testified that Mother did not provide support during the four months immediately preceding the filing of the petition. She further stated that Mother has never provided support even though she was made aware of her duty to do so. This testimony was not refuted. Further, Mother has offered no excuse nor reason why she did not provide support. CM Brown affirmed that she is able-bodied and capable of working. In its final order, the juvenile court stated that CM Brown's testimony was sufficient proof to show Mother did not provide support during the requisite four-month period. It also found that CM Brown was "absolutely credible." "When the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016). This Court affords considerable deference to the weight and credit a trial court places on a witness's testimony. *See Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014); *In re Navada N.*, 498 S.W.3d at 591. Therefore, CM Brown's testimony regarding Mother's lack of support is sufficient evidence on this issue.

The record shows that Mother did not provide support for Braden from December 11, 2018 to April 10, 2019. Mother received the initial custody order that stated she had a duty to provide support for Braden. She was also reminded of this duty when she would attend court proceedings before the juvenile court or meetings with CM Brown. Further, each permanency plan—all of which Mother helped develop and to which she agreed—

---

[7] Under previous versions of the Code, to assert abandonment by failing to support, a petitioner was required to prove the parent *willfully* failed to support the child. *See, e.g.*, *In re Addalyne S.*, 556 S.W.3d at 789.

stated she was responsible for paying child support. Mother has simply provided no justifiable excuse for failing to provide support in this case. Accordingly, we affirm the juvenile court's finding that Mother abandoned Braden for failing to provide support. *See* Tenn. Code Ann. §§ 36-1-102(1)(A)(i), -113(g)(1).

## 2. Abandonment – Failure to Establish a Suitable Home

Abandonment may also occur under Tennessee Code Annotated section 36-1-113(g)(1) when a parent fails to obtain and sustain a suitable home for the child. Section 36-1-102(1)(A)(ii) states that a parent has "abandoned" a child when:

(a) The child has been removed from the home or the physical or legal custody of a parent . . . by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

(b) The juvenile court found . . . that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(c) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.

Tenn. Code Ann. § 36-1-102(1)(A)(ii)(a)-(c) (2019).

As stated above, in order for a court to terminate parental rights under this ground, it must find "that a parent failed to provide a suitable home for his or her child even after DCS assisted that parent in his or her attempt to establish a suitable home." *In re Jamel H.*, E2014-02539-COA-R3-PT, 2015 WL 4197220, at *6 (Tenn. Ct. App. July 13, 2015). Although the parent is required to make "reasonable efforts" to establish a suitable home, "successful results" are not required. *In re D.P.M.*, No. M2005-02183-COA-R3-PT, 2006 WL 2589938, at *10 (Tenn. Ct. App. Sept. 8, 2006). DCS must make "reasonable efforts" to assist the parent by doing more than simply providing a list of service providers. *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016). Efforts made by DCS shall "be reasonable if such efforts equal or exceed

the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department." Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c). DCS should utilize its superior resources in assisting a parent to find a home, but "[its] efforts do not need to be 'Herculean.'" *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014) (citing *Dep't of Children's Servs. v. Estes*, 284 S.W.3d 790, 801 (Tenn. Ct. App. 2008), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015)). *See also In re Matthew T.*, 2016 WL 1621076, at *7.

In the present case, on January 24, 2018, DCS filed its petition alleging that Braden was dependent and neglected. That same day, the juvenile court entered a protective custody order that removed Braden from Mother's custody and placed him with DCS. Since Braden was removed from Mother's physical custody on January 24, 2018, Mother has never established a suitable home. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c).

The juvenile court found that in the four months following Braden's removal, DCS made numerous efforts to help Mother find a suitable home. CM Brown's testimony, which was completely undisputed by Mother, described those efforts. CM Brown did much more than provide a list of service providers. She aided Mother by working with her to develop the first permanency plan. After the initial plan was developed, CM Brown explained the importance of completing the plan's requirements, encouraged Mother to complete the plan's requirements, and provided her with information on service providers. CM Brown also helped schedule Mother's appointments, offered or provided Mother transportation, and encouraged Mother's sobriety. CM Brown conducted drug screens with Mother and attempted to conduct home visits to assess her living conditions. In the four months after Braden's removal, CM Brown held child and family team meetings to review Mother's progress and determine if there were any barriers to Mother's success that could be eradicated. Based on these facts, we agree with the juvenile court that DCS made reasonable efforts to assist the Mother to establish a suitable home for Braden.[8]

In contrast to the efforts made by DCS, Mother made essentially no effort to establish a suitable home. Initially, after his removal, she was incarcerated. Then, she lived with her father for approximately two weeks before moving into her "camper trailer." CM Brown conducted several home visits at the trailer and found several issues with the

---

[8] On appeal, Mother argues DCS failed to prove this ground by clear and convincing evidence because it did not establish when CM Brown made these efforts. In doing so, Mother points to a single instance during CM Brown's direct examination where counsel for DCS mistakenly referred to April 25, 2019 instead of May 25, 2019. Respectfully, we disagree. The record is clear that CM Brown made significant efforts to assist Mother directly after Braden's removal and beyond. Regardless, as we have previously explained, under section 36-1-102(1)(A)(ii), "[a]s long as the proof relates to 'a period of four (4) months following the removal,' . . . the ground may be established [because] the statute *does not* limit the court's inquiry to a period of four months *immediately* following the removal." *In re Jakob O.*, No. M2016-00391-COA-R3-PT, 2016 WL 7243674, at *13 (Tenn. Ct. App. Dec. 15, 2016) (citation omitted).

home. She stated that it lacked electricity, had little ventilation, and had inadequate flooring. Even if we can assume the physical attributes of the home are appropriate for a child, Mother's actions failed to establish a suitable home. *See In re Navada N.*, 498 S.W.3d at 595 (stating "[a] suitable home 'requires more than a proper living location'") (quoting *In re Hannah H.*, 2014 WL 2587397, at *9). CM Brown testified that Mother did not complete her psychological evaluation, parenting assessment, or provide proof of means of income. While Mother attended some visitations during this time, she did not attend all of them and frequently drank alcohol during or before the visits. Mother also admitted to using illegal drugs during this time period.

Based on her actions, or lack thereof, in the months following Braden's removal, we cannot say Mother made reasonable efforts to remedy the conditions that led to Braden's removal. We have held before that a parent's continued use of drugs and alcohol "demonstrate a lack of concern for the welfare of the [child] such that it [is] unlikely that the conditions would be remedied at an early date." *In re Hannah H.*, 2014 WL 2587397, at *9. *See also In re Aaralyn O.*, No. W2017-01411-COA-R3-PT, 2018 WL 468246, at *7 (Tenn. Ct. App. Jan. 18, 2018) (holding a parent's continued drug use shows the parent is "either unable or unwilling to maintain a safe and stable home"). In the months preceding the final hearing, Mother continued to use drugs, engage in criminal activities, and live in an unsuitable home for Braden. Her lack of effort demonstrates a lack of concern for Braden to such a degree that it appears unlikely she will provide a suitable home at an early date. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c). In contrast to Mother's lack of effort, DCS made significant efforts to assist Mother in finding a suitable home.

Therefore, we find that DCS made reasonable efforts to aid Mother in establishing a suitable home for Braden, and Mother did not make reciprocal efforts. As a result, the record shows by clear and convincing evidence that Mother failed to provide a suitable home for Braden. Tennessee Code Annotated sections 36-1-113(g)(1) and -102(1)(A)(ii) have been established as a ground for termination of Mother's parental rights.

### 3. Substantial Non-Compliance with the Permanency Plan

Grounds for termination of parental rights may also be established if "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). In order to sufficiently prove this ground, "[DCS] must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004) (citing *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002); *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003)). Then, DCS must prove "that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *Id.* (citing *In re Valentine*, 79 S.W.3d at 548-59; *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854,

- 11 -

at *12 (Tenn. Ct. App. June 3, 2003)).

"Determining whether a parent has substantially complied with a permanency plan involves more than merely counting up the tasks in the plan to determine whether a certain number have been completed and 'going through the motions' does not constitute substantial compliance." *In re Carrington H.*, 483 S.W.3d at 537 (citing *In re Valentine*, 79 S.W.3d at 547). It will be insufficient to only show "that a parent has not complied with every jot and tittle of the permanency plan." *In re Ronon G.*, No. M2019-01086-COA-R3-PT, 2020 WL 249220, at *8 (Tenn. Ct. App. Jan. 16, 2020) (quoting *In re M.J.B.*, 140 S.W.3d at 656). "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *In re M.J.B.*, 140 S.W.3d at 656.

Despite Mother's contentions to the contrary, it is clear that she failed to substantially comply with the requirements of any of the four versions of the permanency plan. Throughout the differing versions of the permanency plan, Mother was required to submit to an alcohol and drug assessment and follow its recommendations, report to DCS within 24 hours if she relapses during her drug and alcohol treatment, complete psychological and parenting assessments, obtain and maintain stable employment, resolve her criminal issues and avoid incurring new charges, sign release forms for DCS to contact her providers, take advantage of all possible visitations with Braden, and maintain a bond with Braden. Braden was removed from Mother's custody due to her substance abuse and environmental neglect. Accordingly, we agree with the juvenile court that these requirements are reasonable and related to remedying the conditions that led to Braden's removal.

Despite the efforts CM Brown made to assist Mother, the only requirement Mother fully completed was signing release forms for DCS to contact her providers. Mother began a rehabilitation program but did not complete it. She completed the first part of an alcohol and drug assessment, but she did not follow any of the corresponding recommendations. She attended some visitations, but there were several instances when Mother did not report to CM Brown and missed visitations. Further, CM Brown testified that Mother admitted that she continued to consume illegal drugs and alcohol. Yet, there is no evidence that she ever reported a relapse to DCS. Mother also failed to obtain a stable and safe home and continued to engage in criminal activity. As of the final hearing, there were three outstanding warrants for her arrest. Finally, it is evident from CM Brown's testimony that Mother failed to maintain a bond with Braden. On multiple occasions, Braden would either ask to leave a visitation early or would ask not to go at all.

Again, Braden was removed from Mother's care due to her drug use and inability to provide sufficient care and an appropriate home for Braden. As such, her noncompliance with the permanency plan requirements are anything but "[t]rivial, minor, or technical deviations." *See In re M.J.B.*, 140 S.W.3d at 656. Mother's noncompliance was

- 12 -

substantial.  *See id.*  She was not only aware of the requirements of each permanency plan, she helped develop each plan and understood the significance of completing the requirements.  Taken together, there is clear and convincing evidence to show substantial noncompliance with the permanency plan.

### 4.  Persistence of Conditions

Next, we shall address the juvenile court's finding that persistence of conditions was proven by clear and convincing evidence.  Persistence of conditions applies as a ground for termination of parental rights when:

> (A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> > (i)   The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
> >
> > (ii)   There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
> >
> > (iii)  The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;
>
> (B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard.

Tenn. Code Ann. § 36-1-113(g)(3) (2019).

"A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re Navada N.*, 498 S.W.3d at 605 (omission in original) (quoting *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)). When determining whether "conditions persist," a court may consider the conditions that led to a child's removal from a parent's custody as well as any other conditions that are likely to cause a child to be subject to further abuse and neglect.  Tenn. Code Ann. § 36-1-113(g)(3)(A)(i); *In re Audrey S.*, 182 S.W.3d at 872.  Under this ground, a parent's inability

to eliminate such conditions does not need to be willful. *In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012).

In the present case, Braden was removed from Mother's custody on January 24, 2018. On March 19, 2018, the juvenile court adjudicated him dependent and neglected. The final hearing on the petition to terminate Mother's parental rights took place on February 7, 2020. Based on this undisputed sequence of events, Braden was clearly removed from Mother's custody for a period of six months, and the six-month period accrued well before the final hearing. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(i), (B).[9]

Many of the conditions that led to Braden's removal persist. In January 2018, Braden was removed due to Mother's drug use, alcohol abuse, and environmental neglect. Mother continues to consume illegal drugs and drink alcohol and engage in criminal activity. Additionally, as testified to by CM Brown, Mother's current home has several attributes that would likely lead to environmental neglect of a child. It is clear from the record that the conditions that led to Braden's removal, Mother's drug use and unsuitable home, as well as her continued criminal activity, persist. We agree with the juvenile court in that, should Braden return to Mother's custody, it is likely that these conditions would subject him to further neglect. *See id.* § 36-1-113(g)(3)(A)(i).

Again, Mother was given over two years to remedy the conditions that led to Braden's removal. Through CM Brown, Mother was afforded a great deal of support to help eliminate the conditions. CM Brown worked with Mother to develop and execute the permanency plan, she helped schedule Mother's appointments and visitations, she offered to provide Mother transportation, she conducted drug screens and encouraged sobriety, and she attempted to visit Mother's home to assess its environmental conditions. Considering the length of time Mother was afforded to eliminate the conditions, her lack of progress, and the efforts made by CM Brown to aid Mother, we find that there is little likelihood Mother will remedy the conditions at an early date. *See id.* § 36-1-113(g)(3)(A)(ii).

Under subsection (iii), it is apparent that a continuation of a parent-child relationship

---

[9] In her brief, Mother argues that the March 2018 order that adjudicated Braden dependent and neglected was not final because the putative father (who was a party in the dependent and neglect proceedings) was never served with the adjudicatory or dispositional orders. Mother argues further, "[w]ithout a final order previously finding Braden to be dependent and neglected, the ground of persistence of conditions does not apply." This argument is without merit. Under the applicable version of section 36-1-113(g)(3), the order removing a child from a parent's custody can be "entered at *any stage* of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child." Tenn. Code Ann. § 36-1-113(g)(3)(A) (emphasis added). Thus, the juvenile court order that removed the child from custody need not be final in order for persistence of conditions to be established. *See also In re Savannah M.*, No. M2018-00752-COA-R3-PT, 2019 WL 354869, at *5 n.12 (Tenn. Ct. App. Jan. 28, 2019) (stating that under the statute, as amended on July 1, 2018, the persistence of conditions ground applies when a child has been removed from a parent's custody for six months by an order entered *at any stage* of the proceedings involving a petition that alleges the child is dependent and neglected).

between Mother and Braden would greatly diminish his chances of integrating into a safe and stable home. *See id.* § 36-1-113(g)(3)(A)(iii). Mother's visits with Braden were minimal and occurred less frequently in recent months. The low-quality of the visits and Braden's desire to leave them early or not visit at all indicate that there is no longer a significant or meaningful bond between Mother and Braden. A continuation of this tumultuous parent-child relationship would not be to Braden's benefit. Further, Braden is currently in a safe and stable home. He has developed positive connections with Donald and April, who have expressed an intent to adopt him should the petition in this case be granted.

For these reasons, we find that the requirements of Tennessee Code Annotated section 36-1-113(g)(3) have been satisfied by clear and convincing evidence. DCS has sufficiently proven persistence of conditions as a ground for termination of Mother's parental rights.

### 5.  Failure to Manifest an Ability and Willingness to Parent

Under Tennessee Code Annotated section 36-1-113(g)(14), a court may terminate a party's parental rights when:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

This is a relatively new ground for termination. *See In re Jayda H.*, No. E2019-00855-COA-R3-PT, 2019 WL 6320503, at *9 (Tenn. Ct. App. Nov. 25, 2019). This ground requires a petitioner to prove two elements. First, there must be clear and convincing proof that the parent "failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child." *In re Keilyn O.*, No. M2017-02386-COA-R3-PT, 2018 WL 3208151, at *8 (Tenn. Ct. App. June 28, 2018). *See also In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018). Second, the petitioner must prove that placing the child in the parent's custody would pose a risk of substantial physical or psychological harm to the child. *In re Keilyn O.*, 2018 WL 3208151, at *8; *In re Maya R.*, 2018 WL 1629930, at *7.

Since this ground was added to section 36-1-113(g), a "split" of authority has developed on the first element. *See In re Colton B.*, No. M2018-01053-COA-R3-PT, 2018 WL 5415921, at *9-10 (Tenn. Ct. App. Oct. 29, 2018) (describing the differing approaches). Some panels have held that a petitioner must "prove both an inability *and* an unwillingness of the parent to assume custody or financial responsibility." *Id.* at *9. In comparison, other panels have held that a petitioner must prove "that a parent has failed to

- 15 -

meet the requirement of manifesting both a willingness and an ability to assume legal and physical custody of the child *or* has failed to meet the requirement of manifesting both a willingness and an ability to assume financial responsibility of the child." *In re Jayda H.*, 2019 WL 6320503, at *9 (emphasis added) (quoting *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *14 (Tenn. Ct. App. June 20, 2018)). However, these differing approaches are not relevant if "the parent has manifested neither a willingness nor an ability to assume custody and responsibility." *In re Dylan S.*, No. E2108-02036-COA-R3-PT, 2019 WL 5431878, at *8 (Tenn. Ct. App. Oct. 23, 2019) (citing *In re J'Khari F.*, No. M2018-00708-COA-R3-PT, 2019 WL 411538, at *15 (Tenn. Ct. App. Jan. 31, 2019); *In re Colton B.*, 2018 WL 5415921, at *9-10).[10]

Based on the facts of this case, we do not find a need to address the split of authority. From January 2018 to February 2020, Mother failed to manifest either a willingness or an ability to parent Braden. During that time period, Mother has provided no financial support; she has continued to incur criminal charges; she continued to use illegal drugs; and she failed to provide a suitable home for Braden. Furthermore, Mother missed several opportunities to visit Braden and often drank alcohol at or before visits. Even on the day of the final hearing, a day of great magnitude in a case that would render significant consequences for Mother should DCS be successful, Mother did not appear. Mother was informed of the hearing date and its importance several days beforehand; she was offered transportation to court by CM Brown; and CM Brown went to Mother's residence the morning of the hearing to transport her. Yet, Mother was absent from the courtroom. Mother's inability to provide necessities for Braden and her continued volatile behavior shows she is unwilling and unable to assume custody or financial responsibility of Braden. *See In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018) (stating a parent's "[a]bility focuses on the parent's lifestyle and circumstances"); *In re Amynn K.*, 2018 WL 3058280, at *15 (stating "[the parent's] actions, including his continued criminal activity and his failure to financially support the Child, raise doubt as to [his] actual willingness to assume custody or financial responsibility for the Child"). DCS has satisfied its burden and proven the first element of this ground by clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(g)(14); *In re Keilyn O.*, 2018 WL 3208151, at *8.

Turning now to the second prong of section 36-1-113(g)(14), we find that there is clear and convincing evidence to show that placing Braden in the custody of Mother would subject him to a risk of substantial psychological and physical harm. Mother's current home and lifestyle are not the appropriate setting to care for a child. CM Brown testified that Braden himself has expressed concerns for his own safety when he is with Mother. In comparison, Donald (Braden's foster parent) testified at length about Braden's positive

---

[10] In *In re Neveah M.*, No. M2019-00313-COA-R3-PT, 2020 WL 1042502 (Tenn. Ct. App. Mar. 4, 2020), this Court noted the split of authority on this ground. *Id.* at *16 n.8. Recently, the Supreme Court granted permission to appeal in *In re Neveah M.*, but it has yet to issue an opinion.

- 16 -

progression since entering his home. Braden has developed bonds with Donald, his wife April, and the other children in their home. Removing Braden from a positive home that he is comfortable in and has grown attachments to would be detrimental to both his psychological and physical wellbeing. Having determined that both elements of section 36-1-113(g)(14) have been proven by clear and convincing evidence, we find that Mother has failed to manifest an ability and willingness to parent Braden.

### B. *Best Interest of the Child*

After a petitioner proves at least one ground for termination of parental rights, it must then prove by clear and convincing evidence that terminating the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c) (2019); *In re Adoption of Angela E.*, 402 S.W.3d at 639; *In re Navada N.*, 498 S.W.3d at 606 (citing *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004)). Courts are instructed to consider the non-exhaustive list of factors in Tennessee Code Annotated section 36-1-113(i) to make its best interest determination. *In re Navada N.*, 498 S.W.3d at 607. The unique circumstances of each case determine the relevancy and weight a court may give to each factor. *In re Audrey S.*, 182 S.W.3d at 878. "[W]hen the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child." *In re Navada N.*, 498 S.W.3d at 607 (citing Tenn. Code Ann. § 36-1-101(d)).

The nine factors listed in the Code are as follows:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or

psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).

Over two years have transpired since DCS received the referral that alleged Braden was suffering from a lack of supervision, psychological harm, physical abuse, and exposure to drugs and alcohol. Shortly after DCS received the referral, Braden entered DCS custody. Since that time, Mother has continued to exhibit many of the actions that led to Braden's removal. Her criminal activity, drug use, lack of financial support, and unsuitable home would likely cause Braden to suffer further neglect should he return to her home. Mother has been given many opportunities and support to satisfy the requirements of the permanency plan, but she failed to complete the vast majority of its tasks. Since she has made almost no progress in adjusting her lifestyle in two years, it is unlikely that Mother will make sufficient changes to her lifestyle in the near future. Factors (1) and (2) weigh in favor of terminating Mother's parental rights.

Mother did visit Braden after he left her custody, but these visits were minimal and of low quality. Visitations were often cancelled due to Mother being incarcerated or her failure to report to CM Brown. Mother admitted to drinking before and during some visits and falling asleep on at least one occasion. Rather than visit, Braden often asked to leave the visitations early or asked to not visit at all. The record indicates that in the months immediately preceding the final hearing Mother did not visit with Braden at all. In the absence of regular visitation or a meaningful bond between Mother and Braden, factors (3) and (4) weigh in favor of termination.

As we have discussed, Braden has developed a bond and attachment towards his new home with Donald and April. He is open and honest with April about his past troubles

with Mother, and he has a "father-son" relationship with Donald. Donald testified that Braden interacts well with the other children in the household and that they often "goof off" together like typical teenagers. Additionally, Donald has coordinated visits between Braden, his sister, and his maternal grandmother. If Mother's parental rights are terminated, Donald intends to continue to allow these visits with other family members. Allowing Braden to maintain a bond with other family members while living in a safe environment will surely benefit his emotional and psychological wellbeing. Considering how well-integrated and attached Braden is in his current home and the individuals that reside with him, factor (5) also weighs in favor of terminating Mother's parental rights.

There is no proof that Mother has directly physically or psychologically abused Braden. However, there was evidence of environmental neglect in Mother's previous home, which Braden resided in prior to leaving Mother's custody. CM Brown testified that when she visited Mother's previous home there was trash and dirty dishes throughout the home, illegal drugs in multiple rooms, molded food, and broken glass in Braden's room. The environmental neglect Mother showed Braden while he was in her care is evidence that factor (6) weighs in favor of termination.

Although Mother has moved since Braden left her custody, her current home is also problematic. CM Brown visited Mother's new home throughout this case and stated that it was concerning. She testified that Mother's new "camper trailer" has no electricity and requires an extension cord to be connected from the outside; it has little ventilation; and it has pressboard flooring. CM Brown also suspected that drug activity may be occurring in the home since several unrelated individuals frequent the home, all of which refused to submit to a drug screen. Taken as a whole, CM Brown described the residence as "very unclean" with several "unsafe conditions." The record shows that Mother does not have a healthy and safe home, and her admitted drug use and continued criminal activity are likely to render her unable to consistently provide care for Braden. Factor (7) also weighs in favor of termination.

While one of the requirements in the permanency plan was for Mother to obtain a psychological assessment and follow its recommendations, there is no evidence in the record to address factor (8). Our inability to address this factor is not fatal to DCS's petition. When conducting a best interest analysis in termination cases, courts are not required to find that every factor supports termination. *In re Matthew T.*, 2016 WL 1621076, at *16 (citing *In re Dominique L.H.*, 393 S.W.3d 710, 719 (Tenn. Ct. App. 2012)).

Finally, in addressing factor (9), CM Brown testified that Mother has provided no financial support of any kind since Braden left her custody. There is no proof in the record to show otherwise. As a result, factor (9) also weighs in favor of terminating Mother's parental rights.

After considering the statutory factors listed in Tennessee Code Annotated section 36-1-113(i) and applying them to this case, we conclude that it is in the best interest of Braden to terminate Mother's parental rights.

## V. CONCLUSION

Based on the foregoing discussion, we affirm the juvenile court's findings that all five alleged grounds for termination have been proven by clear and convincing evidence. We also affirm the finding that it is in the best interest of Braden to terminate Mother's parental rights. As a result, we affirm the juvenile court's order to terminate Mother's parental rights to Braden.

This case is remanded to the trial court for such further proceedings as may be necessary and are consistent with this Opinion. Costs of this appeal are assessed against appellant, Brandi K.W., for which execution may issue, if necessary.

_____
CARMA DENNIS MCGEE, JUDGE